668 F.2d 635
 James RILEY and Loretta Riley, on behalf of themselves and
John M. Riley, their minor child et al.,
Plaintiffs-Appellees,
v.
Gordon M. AMBACH, as Commissioner of Education of the State
of New York et al., Defendants,
Gordon M. Ambach, as Commissioner of Education of the State
of New York, and The State of New York,
Defendants-Appellants.
 No. 465, Docket 80-7600.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 16, 1980.
Decided May 19, 1981.
On Denial of Rehearing July 31, 1981.
 
 Richard C. Cahn, Huntington, N.Y., for appellees.
 Judith A. Gordon and Marion R. Buchbinder, Asst. Attys. Gen., New York City, for appellants.
 Before MOORE, MANSFIELD and NEWMAN, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 The plaintiffs, and appellees in this action, are eighteen learning disabled children and their parents. The defendants, and appellants, are the State of New York and the State of New York's Commissioner of Education, Gordon M. Ambach. The State defendants took actions: (1) defining as handicapped only those learning disabled children who exhibit a discrepancy of 50% or more between expected achievement and actual achievement, and (2) withdrawing a procedure allowing local Committees on the Handicapped ("COHs") to assign learning disabled children to residential schools at State expense. After a hearing deemed a trial on the merits, the District Court held that the State defendants' actions were inconsistent with the federal scheme regarding the education of handicapped children and enjoined those actions. Riley v. Ambach, 508 F.Supp. 1222 (S.D.N.Y., 1980). We believe that the District Court acted too hastily, and should have required that the plaintiffs exhaust state administrative remedies before bringing suit in federal court. Accordingly, we reverse.
 
 I. THE FEDERAL SCHEME
 
 2
 The federal government first directed its attention to the needs of the handicapped in 1973. That first step came in the form of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibited discrimination against the handicapped in programs receiving federal financial aid. The next congressional step, the step which concerns us here, came in 1975, when Congress passed the Education for All Handicapped Children Act ("EHA"), 20 U.S.C. § 1401 et seq.
 
 
 3
 A. The Education for All Handicapped Children Act Generally
 
 
 4
 Congress enacted The Education for All Handicapped Children Act of 1975 "in recognition of the facts that millions of handicapped children were not receiving appropriate educational services in public schools, that state and local educational agencies have both the ability and the responsibility to provide appropriate educational services for all handicapped children, but lack the financial resources to fulfill that duty, and that it is in the national interest for the federal government to assist state and local educational agencies' efforts to educate handicapped children." Harris v. Campbell, 472 F.Supp. 51, 53 (E.D.Va.1979). The Act provides for federal grants-in-aid in support of state efforts to educate the handicapped.
 
 
 5
 In order to receive federal financial assistance, a state must meet a number of requirements. A state must have "in effect a policy that assures all handicapped children the right to a free appropriate public education", 20 U.S.C. § 1412(1). A state must develop a plan setting forth policies, procedures, facilities, personnel requirements and services necessary to meet that goal. 20 U.S.C. § 1412(2). The plan must set forth policies and procedures to assure that "all children residing in the State ... who are in need of special education and related services are identified, located, and evaluated, and that a practical method is developed and implemented to determine which children are currently receiving needed special education and related services and which children are not...." 20 U.S.C. § 1412(2)(C). Local educational agencies must determine whether children are handicapped, and, where a child is classified as handicapped, must develop and annually revise an Individualized Educational Program ("IEP") for that handicapped child. 20 U.S.C. §§ 1401(19), 1412(4), 1414(a)(5); 45 C.F.R. § 121a.343(d). In New York, the determination of whether a child is handicapped and the formulation of an IEP where necessary is the responsibility of the Committee on the Handicapped of the local school district. N.Y. Educ. Law (McKinney) § 4402.1.
 
 
 6
 Federal regulations require that the state provide the handicapped with regular or special education and related aids and services that "are designed to meet the individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met...." 45 C.F.R. 84.33(b)(1) (i). That special help should be provided in the least restrictive environment responsive to the child's individual needs, 45 C.F.R. 121a.55; Stuart v. Nappi, 443 F.Supp. 1235, 1242 (D.Conn.1978). To "the maximum extent appropriate", handicapped children should be "educated with children who are not handicapped". The state must assure that "special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids cannot be achieved satisfactorily". 20 U.S.C. § 1412(5)(B).
 
 B. The Severe Discrepancy Standard
 
 7
 The federal definition of when a learning disabled child is handicapped is crucial to this case. Under the EHA the term "handicapped children" means "mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services". 20 U.S.C. § 1401(1) (emphasis added). The term "children with specific learning disabilities"
 
 
 8
 "means those children who have a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Such disorders include such conditions as perceptual handicaps, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Such term does not include children who have learning problems which are primarily the result of visual, hearing, or motor handicaps, of mental retardation, of emotional disturbance, or of environmental, cultural, or economical disadvantage." 20 U.S.C. § 1401(15).
 
 
 9
 In order to be treated as handicapped under the EHA, a learning disabled child must show "a severe discrepancy between achievement and intellectual ability in one or more of the following areas: (i) Oral expression; (ii) Listening comprehension; (iii) Written expression; (iv) Basic reading skill; (v) Reading comprehension; (vi) Mathematics calculation; (vii) Mathematics reasoning". 45 C.F.R. 121a.541(a)(2) (emphasis added). A child may not be identified as having a specific learning disability if the severe discrepancy between ability and achievement is primarily the result of (i) a visual, hearing or motor handicap; (ii) Mental retardation; (iii) Emotional disturbance; or (iv) Environmental, cultural, or economic disadvantage. 45 C.F.R. 121a.541(b).
 
 
 10
 C. Residential Placements Required When Necessary
 
 
 11
 The role of residential placements in treating learning disabled children is another important factor in this case. In the most general of terms, the federal scheme does state that all "placement decisions must be made on an individual basis". 45 C.F.R. 121a.552 (Comment). Individualized placement decisions are facilitated by the requirement that "(e)ach public agency shall insure that a continuum of alternative placements is available to meet the needs of handicapped children for special education and related services", 45 C.F.R. 121a.551. The continuum must include "special classes", "special schools", and "instruction in ... institutions". 45 C.F.R. 121a.551(b)(1). Residential placements are not explicitly required by this provision.
 
 
 12
 The role of residential placement is buttressed by a federal regulation which states that "(i)f placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child". 45 C.F.R. 121a.302. Learning disabled children are deemed handicapped when they suffer from a severe discrepancy between intellectual ability and achievement, and then come within this provision.
 
 
 13
 D. Exhaustion of Administrative Remedies Required
 
 
 14
 The EHA requires that states participating in the EHA's federal grants-in-aid program establish procedures by which parents or guardians may challenge the evaluation and placement of a child by the local educational agency. A state must provide "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child". 20 U.S.C. § 1415(b)(1)(E). When a complaint is received, "the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(b)(2). If the hearing is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by its findings and decision may appeal to the State educational agency. 20 U.S.C. § 1415(c).
 
 
 15
 New York State has given these hearings requirements operational effect by providing parents the right to appeal the decision of the local Committee on the Handicapped to an impartial hearing officer appointed by the local board of education. The hearing officer will make a recommendation to the board. "An appeal to the commissioner of education will lie from any determination of the board of education." N.Y.Educ.Law (McKinney) § 4404.1.
 
 
 16
 Once those state administrative proceedings are exhausted, any aggrieved party "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State Court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy". 20 U.S.C. § 1415(e)(2).
 
 
 17
 II. THE ACTIONS OF THE STATE DEFENDANTS AND THE DISTRICT
 
 COURT'S DECISION
 
 18
 The District Court enjoined two actions taken by the defendants, the institution of a 50% discrepancy standard and the elimination of the availability of residential placements for learning disabled children.
 
 A. The 50% Discrepancy Standard
 
 19
 The defendant Ambach promulgated a regulation requiring that a learning disabled child "exhibit a discrepancy of 50% or more between expected achievement based on ... intellectual ability and actual achievement" in order to qualify as handicapped under the Education for All Handicapped Children Act. Regulation 200.1(d)(4). The federal statute requires that those children who show a severe discrepancy between achievement and intellectual ability be classified as handicapped.
 
 
 20
 The District Court concluded that the Committees on the Handicapped "cannot translate into the '50% discrepancy' standard the criteria that they are required to consider by the federal definition of children with specific learning disabilities and that, accordingly, enforcement of the rule results in the failure to identify, locate and evaluate children with such disabilities" required by 20 U.S.C. § 1412(2)(C). The District Court based its decision on its finding that the local Committees on the Handicapped reach their decisions on the basis of quantitative tests and grade scores and that a standard relying on standardized tests is inappropriate given inadequate and inaccurate testing procedures. The Court found that the 50% rule was more restrictive than the severe discrepancy standard, and would deny special education to children otherwise qualified to receive special education under federal law.
 
 
 21
 B. The Elimination of Residential Placements
 
 
 22
 State law requires that the New York State Commissioner of Education maintain a register of schools qualified to meet the educational needs of handicapped children. N.Y.Educ.Law (McKinney) § 4407.4. A handicapped child is eligible for placement in a school on this list at public expense if no appropriate education is available in either the child's school district, a neighboring school district, or through the area Board of Cooperative Educational Services Program ("BOCES"). N.Y.Educ.Law (McKinney) §§ 4401.2, 4402.2. Defendant Ambach has removed from that list all residential schools serving children with specific learning disabilities, acting on the ground that learning disabilities do not necessitate residential treatment.
 
 
 23
 The District Court found that a residential school must be an option available to the local Committee on the Handicapped. The Court relied on federal law. The relevant federal requirements are, first, that a state make available a continuum of educational placements for children, 45 C.F.R. 121a.551, and, second, that if placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child. 45 C.F.R. 121a.302.
 
 
 24
 The District Court wholly accepted the notion that there are cases in which residential placements are necessary. And it found that the requirement that placement decisions be made on an individual basis, 45 C.F.R. 1221a.552 (Comment), overcomes the damage that residential placements might do to the fulfillment of the statutory requirement that handicapped children be educated in the least restrictive environment, 45 C.F.R. 121a.550; Stuart v. Nappi, 443 F.Supp. 1235, 1242 (D.Conn.1978). Yet the Court expressly refused to decide "whether residential treatment is or is not, in fact, necessary for an individual plaintiff, or whether appropriate services for learning disabled children are or are not available in the local district in which plaintiffs reside". The Court chose to rely instead on the judgment of the local COHs, rejecting the considered judgment of the State Commissioner that residential placements are not necessary.
 
 III. DISCUSSION
 
 25
 Unlike the District Court, we decline to reach the merits of the plaintiff's claim. Instead, we reverse for failure to exhaust administrative remedies.A. Exhaustion of Administrative Remedies Generally
 
 
 26
 The philosophy of the Education for All Handicapped Children Act is that a plaintiff must first exhaust the state administrative remedies provided under the Act, including the administrative appeals provisions, before bringing an action in federal court to challenge the evaluation and placement of a child. In New York State, the decision of the local Committee on the Handicapped must first be appealed to an impartial hearing officer appointed by the local board of education, who then makes a recommendation to the local board of education. The board's decision may then be appealed to the Commissioner of Education. N.Y.Educ.Law (McKinney) § 4404.1. Only when these state administrative remedies have been exhausted may a suit be brought in federal court. 20 U.S.C. § 1415(e)(2). The federal court shall then "receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate". 20 U.S.C. § 1415(e)(2).
 
 
 27
 Two sound policies support the statutory requirement that plaintiffs exhaust administrative remedies before bringing federal actions. Both have particular relevance in this case.
 
 
 28
 First, a "strong state interest is reflected in the establishment of a comprehensive scheme of regulation; authority over the subject matter of the dispute has been vested in an expert supervisory body, far more familiar than a federal court with local factors that legitimately affect administration." Comment, Exhaustion of State Remedies Under the Civil Rights Act, 68 Colum.L.Rev. 1201, 1206 (1968). If the expert agency cannot resolve the problem finally, the record made in the administrative proceedings will be extremely helpful to the court, since the administrative agency will likely have probed the issue with more expertise than a federal court could bring to bear, and therefore, have illuminated the issue for final decision in the federal court.
 
 
 29
 Those considerations are important ones here. The questions in this case are difficult and technical ones. The plaintiffs argue that a 50% discrepancy standard is more restrictive than a severe discrepancy standard, and that residential placements are necessary for some learning disabled children. These are issues upon which the state experts should first have their say. If that say does not resolve the issue, the record created by the application of their expertise to those problems will certainly help the federal court resolve the issue in a more informed manner.
 
 
 30
 Second, the "states, as well as the federal government have an interest in providing a means whereby official abuse can be corrected without resort to lengthy and costly trial". Comment, Exhaustion of State Remedies Under the Civil Rights Act, 68 Colum.L.Rev. 1201, 1206 (1968). Resort to administrative processes is a desirable alternative to litigation in the federal courts.
 
 
 31
 B. The 50% Rule; No Waiver of the Exhaustion Requirement
 
 
 32
 There are cases in which "(s)tate administrative remedies have been deemed inadequate by federal courts, and hence not subject to the exhaustion requirement, on a variety of grounds." Gibson v. Berryhill, 411 U.S. 564, 575 n. 14, 93 S.Ct. 1689, 1696 n. 14, 36 L.Ed.2d 488 (1973). In some cases this has been because of delay by the agency, Smith v. Illinois Bell Telephone Co., 270 U.S. 587, 591, 46 S.Ct. 408, 409, 70 L.Ed. 747 (1926). In other cases this has been because of doubt as to whether the agency was empowered to grant effective relief, Union Pacific Railroad Co. v. Board of County Commissioners, 247 U.S. 282, 287, 38 S.Ct. 510, 512, 62 L.Ed. 1110 (1918); McNeese v. Board of Education, 373 U.S. 668, 676, 83 S.Ct. 1433, 1438, 10 L.Ed.2d 622 (1963). State administrative remedies have also been held inadequate where the state administrative body was found to have predetermined the issue before it. Kelly v. Board of Education, 159 F.Supp. 272, 276 (M.D.Tenn.1958). The rule that a plaintiff must exhaust state administrative remedies before bringing a federal suit under the Education for the Handicapped Act has accordingly been bypassed in cases where the exercise of state administrative remedies would be futile, Armstrong v. Kline, 476 F.Supp. 583, 601-2 (E.D.Pa.1979), cause remanded on other grounds, Battle v. Pennsylvania, 629 F.2d 269 (3d Cir. 1980); Loughran v. Flanders, 470 F.Supp. 110, 113 (D.Conn.1979). "The dispute over exhaustion reduces to one issue: whether there is a meaningful administrative enforcement mechanism for the vindication of personal rights ... It is a well-established principle of administrative law that exhaustion is not required if the only available administrative remedy is plainly inadequate." Patton v. Dumpson, 498 F.Supp. 933, 940 (S.D.N.Y.1980).
 
 
 33
 The District Court found that resort to state administrative processes would prove futile in this case. We disagree. We do not think that the plaintiffs have made the requisite showing that they cannot secure the relief they seek from the state.
 
 
 34
 The principal argument against the Commissioner's 50% standard is that it is quantitative while the EHA standard of "severe discrepancy" is qualitative, from which the plaintiffs argue that there will be significant undercounting of handicapped children because some might be suffering a severe discrepancy even though they do not meet the 50% standard. The State contends in reply that its regulations mandate the use of qualitative as well as quantitative factors. In such a vague area, where expert witnesses love to revel, we would prefer a concrete case coming to us after the plaintiffs have exhausted state administrative remedies. Such a case may never appear; the state experience may result in a virtual equivalency between these two amorphous standards. The 50% standard may in practice prove to be no more restrictive than the severe discrepancy rule. The Commissioner contends that the rule will be administered flexibly and qualitatively, that it is an interpretive rule and not a restrictive one. If the rule is not flexibly administered, first resort should be to state processes and the Commissioner. There is no reason to think the Commissioner will fail to enforce the law. Resort should thus be made to the state processes before it is made to the federal judicial process.
 
 
 35
 C. The 50% Rule; Exhaustion of Administrative Remedies
 
 
 36
 Both the significance of the 50% rule and its deficiencies will be much more clearly focused when a particular child can show that application of the rule caused his or her ineligibility in circumstances where he or she would have qualified under the prior standard. The classification of the plaintiff Eoanidis does not require adjudication, for it does not appear to have had any consequence. An Individual Education Program was developed for him, so the misclassification, if it occurred, was harmless. The plaintiffs also argue that they should be able to challenge the 50% rule because they face annual reclassification, and, if the 50% rule is invalid, they should be able to secure a ruling now that they need not be subject to it. That argument, however, is premised on the assumption that the 50% rule will be used as a strictly quantitative rather than qualitative test and will in fact prove more restrictive in operation than the "severe discrepancy" standard.
 
 
 37
 We are at this time unwilling to make such an assumption. On the one hand, we see approval of the 50% standard by the Department of Health, Education and Welfare, as indicated by its response to private inquiries: "(T)here is nothing in the federal regulations that prohibits a state from using the 50% discrepancy level for determining whether a child has a specific learning disability." Letter dated Aug. 16, 1978 from Jerry W. Vlasak, Ph.D., Compliance Officer for P.L. 94-142, Bureau of Education for the Handicapped. On the other hand, we are also faced with the view of the defendant Ambach's Advisory Panel for the Education of Children with Handicapping Conditions that the rule is "instrumental in the denial of special education to children otherwise qualified to receive special education" and "since appropriate utilization of local multidisciplinary teams will more effectively identify children with a specific learning disability without a guide of 50% discrepancy, which has become a requirement that effectively denies special education to many children," the rule should be "deleted in its entirety".
 
 
 38
 Rather than balance such views in the abstract, we think the merits of the challenge to the standard will be more appropriate for adjudication in a case in which the standard has been applied. While the plaintiffs have mounted a substantial attack on the standard, an attack found persuasive by the District Court, many of the shortcomings of the standard stem from predictions as to how it will be applied in practice. When the merits of a dispute are better resolved on a detailed factual record, a court properly may elect to await the events that will permit the development of such a record. Toilet Goods Association v. Gardner, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). In essence, the plaintiffs' attack on the 50% discrepancy standard is premature until it has been applied in the classification or reclassification of a handicapped child.
 
 D. Exhaustion and Residential Placement
 
 39
 Residential placement presents a much closer issue. Federal regulations require the availability of residential placements for all handicapped children (which includes severely learning disabled children) at State expense where it "is necessary to provide special education and related services to a handicapped child", 45 C.F.R. 121a.302. The Commissioner has, however, made a blanket decision that residential placements are not necessary for learning disabled children unless they suffer from an additional problem, such as emotional disturbance. Here exhaustion of state remedies might prove futile, since residential placement for some learning disabled children who do not suffer from other afflictions has been rejected in advance by the Commissioner, who has taken a predetermined stance that residential placement will not be "necessary". Yet exhaustion also might not prove futile, as the Commissioner might reverse himself in a compelling case, if he were proved wrong and a residential placement was shown to be clearly necessary for a learning disabled child. Exhaustion, which is required by the statute, may well have afforded and may still afford relief to the plaintiffs.
 
 
 40
 Normally, exhaustion would not be required simply to afford an administrator an opportunity to revise an earlier decision or to make an exception to a previously promulgated rule of general application. But two considerations bear on the appropriateness of deferring adjudication of the ruling on residential placements. First, though it is possible to adjudicate the facial validity of the ruling, such an adjudication will be significantly enhanced by the details of a particular case. Here the District Court, lacking a claim that any plaintiff should be found to need residential placement, was obliged to consider the conflicting evidence on the more generalized question whether learning disabled children, who do not suffer from other afflictions, might ever require residential care. That inquiry inevitably drew the Court into predictions as to what circumstances might arise in the future. A more focused inquiry will occur if one of the plaintiffs, such as Riley, who was denied residential placement, pursues his administrative remedy. A hearing officer will then be able to determine whether such a placement is needed in his case. If it is found to be necessary and if the Commissioner nonetheless disapproves, court adjudication can readily occur not only as to statutory compliance in his case, but also on the broader issue of whether the Commissioner's removal of residential schools from the approved list is lawful. Second, adjudication of such issues after exhaustion of administrative remedies will enable the District Court to have the benefit of the administrative record assembled pursuant to 20 U.S.C. § 1415(e)(2). The issue of residential placement seems especially appropriate for consideration in the context of a specific case brought to court after development of an administrative record.
 
 
 41
 The decision of the District Court is reversed.On Petition for Rehearing
 
 PER CURIAM:
 
 42
 Appellants petition for rehearing, contending primarily that the administrative remedy of N.Y.Educ.Law § 4404(1), which we required to be pursued before the District Court could adjudicate a challenge to the Commissioner's policy concerning residential placements, is not available to the parents of John Riley. On June 12, 1979, Riley's local Committee on the Handicapped ("COH") recommended residential placement for him at the Landmark School in Massachusetts. This recommendation was rejected by the State Department of Education. In light of this rejection, the local COH on August 30, 1979, recommended placement in a local junior high school and also recommended special education classes. On January 2, 1980, the local COH again recommended local placement, but added a proviso to the effect that if the Landmark School were restored to the list of approved schools, the local COH would again recommend placement there for Riley. On these facts, appellants contend that since the local COH has twice expressed its view in favor of residential placement for Riley, his parents do not face the type of unacceptable recommendation that may be challenged administratively under § 4404(1).
 
 
 43
 However, the fact remains that while the COH favors residential placement for Riley, it has recommended local placement. That recommendation is "not acceptable," § 4404(1), to Riley's parents, and we see no reason why they may not challenge it administratively and secure the appointment of an impartial hearing officer to determine whether residential placement is necessary. Our reversal of the District Court's judgment is without prejudice to the right of Riley's parents to return to the District Court in the event that they attempt to pursue their administrative remedy and are unable to secure the appointment of a hearing officer.
 
 
 44
 The petition for rehearing is denied.