962 F.2d 148
 60 USLW 2694, 74 Ed. Law Rep. 1042
 Edward Joseph HELDMAN, on Behalf of his handicapped son,
T.H., and on behalf of himself as an advocate for
handicapped children, Plaintiff-Appellant,
v.
Thomas SOBOL, Commissioner, State Education Department of
New York, Defendant-Appellee.
 No. 446, Docket 91-7581.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 31, 1991.
Decided April 16, 1992.
 
 Michael H. Sussman, Goshen, N.Y., for plaintiff-appellant.
 Martha O. Shoemaker, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., of counsel), for defendant-appellee.
 Before OAKES, Chief Judge, LUMBARD and ALTIMARI, Circuit Judges.
 OAKES, Chief Judge:
 
 
 1
 This case presents the question of whether the parent of a child with a disabling condition who is challenging an alleged system-wide violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1485 (1988 & Supp. II 1990) can overcome the hurdles of standing, justiciability, and exhaustion of administrative remedies. IDEA requires states, which receive grants under the Act, to provide children with disabling conditions with "a free appropriate public education" in the least restrictive environment suitable for the child. §§ 1400(c), 1412(5)(B).[1] Rather than detailing the precise substantive rights applicable to all affected children, Congress opted for individually tailored programs--programs crafted by parents and educators working together to determine what is appropriate for each child. Congress recognized that such an unconventional approach would require extensive procedural safeguards to protect the educational rights of children with disabling conditions. Thus, the scope of these procedural protections--which this case requires us to examine--must be determined in light of their role in ensuring the appropriate application of the Act.
 
 
 2
 Foremost among the procedural safeguards provided for in the Act is the guarantee that parents may contest their child's placement or classification in "an impartial due process [administrative] hearing" and, if dissatisfied with the outcome, they may initiate a civil action in state or federal court. §§ 1415(b)(2)-(e)(2). In this case, we must decide whether section 1415 of IDEA confers on a parent of a disabled child the right to judicial relief for system-wide due process violations. In particular, Edward J. Heldman, on behalf of his son T.H., challenges N.Y.Educ.Law § 4404 (McKinney 1981 & Supp.1992) and its implementing regulation, 8 N.Y.C.R.R. § 200.5(c)(1) (1991), which permit boards of education to appoint the hearing officer before whom the appropriateness of the child's placement must be demonstrated. The United States District Court for the Southern District of New York, Vincent L. Broderick, Judge, granted defendant's motion to dismiss on the grounds that Heldman neither had standing to contest N.Y.Educ.Law § 4404 nor had he exhausted his administrative remedies as required by IDEA prior to bringing suit in federal court. We reverse, holding that this case presents a justiciable controversy, that Heldman has standing to bring suit, and that to require exhaustion of remedies in this case would be futile.
 
 
 3
 * A
 
 
 4
 IDEA created an arena in which a committee composed of special education experts, teachers, and parents could cooperatively determine what constitutes an appropriate education for each disabled child. The findings of the committee are formalized in an "individualized education program" (IEP), which details the child's level of educational performance, the goals for the year, and the educational services needed for the child to achieve these goals. § 1401(a)(19). The IEP process reflects a novel approach to the guarantee of rights to a minority: Congress, in lieu of uniform substantive standards, sought to protect the interests of the child by providing for parental participation in the process of charting an appropriate education for their child. §§ 1400(c), 1401(a)(19), 1412(7), 1415; see also Honig v. Doe, 484 U.S. 305, 310-12, 108 S.Ct. 592, 597-98, 98 L.Ed.2d 686 (1988); Board of Educ. v. Rowley, 458 U.S. 176, 205-06, 208-09, 102 S.Ct. 3034, 3050-51, 3051-52, 73 L.Ed.2d 690 (1982).
 
 
 5
 To ensure that the parents would not be silenced by the very forces that had once excluded disabled children from public education, Congress granted parents the right to seek review of their child's IEP. See generally Laura Rothstein, Rights of Physically Handicapped Persons §§ 2.23-.31 (1984). The parents of a child with a disabling condition may seek a hearing before a hearing officer whose personal and professional interests do not conflict with his or her ability to make an impartial decision. § 1415(b)(2);[2] 34 C.F.R. §§ 300.506-.507 (1991). States may opt for either a single or multi-tiered system of review. If the initial hearing takes place at the local level, the parents may appeal to the state agency for a review of the record. § 1415(c).[3] At the conclusion of the administrative review process, the parties may file a civil suit in federal district court or state court. § 1415(e)(2).[4]
 
 
 6
 Although IDEA sets forth a blueprint for state and local programs, the states are left to fashion the requisite programs. In New York state, the IEP is produced by a Committee on Special Education (CSE), whose members are appointed by the board of education or trustees of the school district. N.Y.Educ.Law § 4402(1)(b)(1) (McKinney 1981 & Supp.1992). New York provides for a two-tiered system for the review of IEPs. A hearing officer, appointed by the board of education from a list of state-certified officers, conducts the initial hearing and makes a recommendation to the board. N.Y.Educ.Law § 4404(1); 8 N.Y.C.R.R. § 200.5(c)(1) (1991). Parties may appeal to the commissioner of education for review of the initial hearing. N.Y.Educ.Law § 4404(2).[5]
 
 
 7
 Heldman claims that the New York state's procedure for the selection of hearing officers is inconsistent with IDEA's due process guarantee. We turn now to the complicated procedural history of this case.
 
 B
 
 8
 This case grew out of a dispute over what constituted an appropriate education for the Heldmans' son, T.H. In 1988, the Heldman family moved into the Minisink Central School District of New York ("Minisink"). The Minisink CSE classified T.H. as learning disabled and placed him in the local high school, augmenting this placement with special education classes. T.H. did not adjust well to the new setting and he attended school irregularly.
 
 
 9
 In January 1989, the CSE met again to modify T.H.'s IEP. Due to the severity of T.H.'s learning disability, the CSE recommended placing him in the Karafin School, a private institution. Although the Heldmans had reservations about the appropriateness of the new placement, they consented to the change because they believed Karafin to be the only state-approved school that could accommodate T.H.'s needs.
 
 
 10
 State approval of the proposed placement, however, was not forthcoming. A month later the CSE changed T.H.'s classification from learning disabled to emotionally disturbed with the understanding that this would expedite approval of the private placement. Following submission of a revised application, the New York State Education Department ("NYSED") approved T.H.'s private placement. The Heldmans' concerns about the appropriateness of T.H.'s placement and classification persisted and they removed T.H. from Karafin three days after his arrival at the school.
 
 
 11
 An emergency meeting of the CSE was convened to resolve the Heldmans' challenge to T.H.'s placement and classification. The CSE changed neither T.H.'s IEP nor his classification. Pursuant to N.Y.Educ.Law § 4404(1), the Heldmans requested an impartial hearing to challenge T.H.'s classification as emotionally disturbed, as opposed to learning disabled, and his placement in Karafin as a denial of an appropriate education. The Minisink Board of Education selected a hearing officer, who had been recommended by the school district's attorney, to preside over the hearing.
 
 
 12
 During the winter of 1989, prior to the dispute over T.H.'s IEP, the Heldmans, acting as concerned citizens, became involved in a dispute over the independence of hearing officers. Frank Eckelt, a hearing officer in an unrelated proceeding, was found to have violated the conflict of interest provisions by serving both as a consultant and hearing officer for a school district. The Heldmans actively campaigned for Eckelt's removal from the list of certified hearing officers. As a result of the Eckelt controversy, the Heldmans were made aware of the potential for abuse within the New York system for the selection of hearing officers. This awareness apparently led them to question the impartiality of the hearing officer, one George Kandilakis, assigned to review T.H.'s IEP. The Heldmans, after being notified of the identity of their hearing officer, requested both a copy of his resume and a disclosure of past and present relationships with either Minisink or the Karafin School. The hearing officer, however, denied these requests.
 
 
 13
 The Heldmans subsequently found a letter in T.H.'s file from Minisink's attorney--the very attorney they would be arguing against in the upcoming hearing--to the Board of Education recommending that they select Kandilakis as the hearing officer. Furthermore, in the letter, the attorney revealed that "[i]t was through Dr. Eckelt that I was able to locate Mr. Kandilakis." On the basis of this information, on March 31, 1989, the Heldmans filed a motion of recusal and withdrew their hearing request pending a decision on the motion. Officer Kandilakis never responded to the motion and, on April 10, 1989, he conducted the hearing without the Heldmans being present.
 
 
 14
 On April 11, 1989, Edward Heldman, pro se, filed suit in federal district court challenging the manner in which hearing officers are selected in New York state, which he claimed had denied T.H. an impartial review of his IEP. The district court dismissed the complaint with leave to amend on July 25, 1990. On August 31, 1990, Heldman filed the current amended complaint, which the district court dismissed for lack of standing and failure to exhaust administrative remedies.
 
 
 15
 Heldman's federal filing did not bring a halt to the state administrative proceedings. The hearing officer rendered a decision on May 30, 1989, which affirmed T.H.'s placement but found that there was insufficient evidence in the record to support classifying T.H. as emotionally disturbed. Heldman appealed the hearing officer's decision regarding placement to the Commissioner of Education on July 15, 1989. On November 15, 1989, the Commissioner held that the Board of Education had no basis to proceed with a hearing once the moving party had withdrawn. The Commissioner ordered the Board of Education to resume the educational services provided to T.H. prior to the placement in Karafin and to reconvene the CSE to draft a new IEP.
 
 
 16
 On remand, the CSE recommended a new placement for T.H. Although Heldman thought the new placement and classification to be inappropriate, he accepted them in hopes that an amicable agreement could be reached without resort to the adversarial process. In April 1990, Heldman abandoned this informal approach and sought a second impartial hearing. On May 14, 1990, Heldman filed a written motion for the new hearing officer to recuse himself. Heldman argued, among other things, that the method of his appointment cast doubt on his ability to review T.H.'s IEP impartially. On May 22, 1990, the hearing officer denied the motion to recuse, at which point Heldman withdrew from the hearing with the apparent intention of appealing the denial to the Commissioner. On July 12, 1990, Heldman served notice that he intended to appeal to the Commissioner. On October 16, 1990, the state administrative review of T.H.'s IEP came to an end with the Commissioner's dismissal of the appeal as untimely because the notice of intention to appeal was filed more than thirty days after the hearing officer's decision. See 8 N.Y.C.R.R. § 279.2(b) (1991).
 
 
 17
 In 1991, the Heldmans, frustrated by Minisink's inability to assure T.H. an appropriate education and by the resulting deterioration of T.H.'s condition, withdrew T.H. from the public school system.
 
 II
 
 18
 Federal courts may decide only actual cases and controversies. See U.S. Const. art. III, § 2.[6] The parameters of the case or controversy limitation emerge from the cluster of justiciability doctrines--doctrines that incorporate concerns about the proper role of the judiciary in a democratic society and the need to assure an adversarial presentation of the issues. See Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 343 (1975); Flast v. Cohen, 392 U.S. 83, 96-97, 88 S.Ct. 1942, 1950-51, 20 L.Ed.2d 947 (1968). To determine whether a federal court may decide the merits of Heldman's claim, we must consider the facts of the present case in light of two of these doctrines--standing and mootness.[7]
 
 
 19
 * The threshold question in every suit brought in federal court is whether the plaintiff has standing to invoke the authority of the federal judiciary. At a minimum, to satisfy the core requirements derived from Article III, a plaintiff must allege: (1) personal injury or threat of injury; (2) that the injury fairly can be traced to the action challenged; and (3) that the injury is likely to be redressed by the requested relief. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); Lamont v. Woods, 948 F.2d 825, 829 (2d Cir.1991).
 
 1. Injury
 
 20
 Congress may create a statutory right the alleged violation of which constitutes injury in fact. Havens Realty Corp. v. Coleman, 455 U.S. 363, 373, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982); Warth, 422 U.S. at 500, 95 S.Ct. at 2206; William Fletcher, The Structure of Standing, 98 Yale L.J. 221, 253-54 (1988). Heldman asserts that section 1415(b)(2) of IDEA confers upon him, as well as all other parents of disabled children, a right to an impartial due process hearing--a right that was infringed when the Minisink Board of Education selected a hearing officer in conformity with N.Y.Educ.Law § 4404 and NYSED regulation 8 N.Y.C.R.R. § 200.5(c)(1), which denied T.H. proper review of his IEP. According to Heldman, the New York system, by allowing boards of education to choose hearing officers, creates a powerful economic and professional incentive for officers to rule in the board's favor; by so ruling officers assure themselves future requests to serve as hearing officer. Such an economic stake in the outcome of a hearing, it is argued, is liable to distort the outcome of the hearing in a way that cannot be corrected by the presentation of evidence at the hearing. Taking Heldman's allegations to be true--as we are required to do in reviewing a dismissal for lack of standing, Warth, 422 U.S. at 501, 95 S.Ct. at 2206--we must determine whether such a system would constitute a violation of IDEA's due process guarantees.
 
 
 21
 It is elementary that the provision of a fair hearing before an impartial tribunal is a basic requirement of due process. To ensure an impartial adjudicator, certain situations have been identified in which the probability of bias reaches unconstitutional proportions. Withrow v. Larkin, 421 U.S. 35, 46-47, 95 S.Ct. 1456, 1463-65, 43 L.Ed.2d 712 (1975). Included among these situations are those in which the adjudicator has an economic stake in the outcome, as alleged in the case at hand. Ward v. Monroeville, 409 U.S. 57, 59-60, 93 S.Ct. 80, 82-83, 34 L.Ed.2d 267 (1972); Tumey v. Ohio, 273 U.S. 510, 531-33, 47 S.Ct. 437, 444-45, 71 L.Ed. 749 (1927). Heldman, however, is alleging a violation of IDEA's due process guarantee and not the Due Process Clauses of the Constitution; therefore, we must examine the due process guarantee embodied in section 1415.
 
 
 22
 The evolution of IDEA reveals that Congress intended, through the section 1415 guarantee of "an impartial due process hearing," to incorporate the full protection of the Due Process Clauses. The legislative history of the 1975 Act points to a pair of federal court cases involving challenges to the exclusion of disabled children from the public schools, see Pennsylvania Ass'n for Retarded Children v. Pennsylvania, 334 F.Supp. 1257 (E.D.Pa.1971) and 343 F.Supp. 279 (E.D.Pa.1972); Mills v. Board of Educ., 348 F.Supp. 866 (D.D.C.1972), as the impetus for the 1975 Act. S.Rep. No. 168, 94th Cong., 1st Sess. 6 (1975), 1975 U.S.C.C.A.N. 1425, 1430; see also Rowley, 458 U.S. at 192-94, 102 S.Ct. at 3043-45. The extensive discussion of these "right to education" cases suggests that the drafters of the Act intended to incorporate the principles set forth in these cases. The legislative history of the 1975 Act confirms this suggestion. Following the case discussion, the legislative history reports that the 1974 Act--a precursor to and the foundation for the 1975 Act--"incorporated the major principles of [these] right to education cases." S.Rep. No. 168 at 8, 1975 U.S.C.C.A.N. at 1432. Among the principles incorporated from these cases is the mandatory provision of "a Constitutionally adequate prior hearing [before placement] and periodic review of the child's status." S.Rep. No. 168 at 6, 1975 U.S.C.C.A.N. at 1430 (emphasis added) (quoting Mills, 348 F.Supp. at 878).
 
 
 23
 The structure of IDEA similarly attests to Congress' concern for adjudicatory independence. The Act relies on parental involvement to contribute to the determination of what constitutes an appropriate education for a child. A system perceived by parents as tainted by biased adjudicators would deter parents from fulfilling their role under the Act. The success of IDEA's novel approach to protecting the rights of disabled children, thus, turns on ensuring the right to adjudicative independence. See generally David Engel, Law, Culture, and Children with Disabilities: Educational Rights and the Construction of Difference, 1991 Duke L.J. 166 (analysis of factors that tend to undermine IDEA's approach to protecting children with disabling conditions). IDEA's procedural guarantees, however, serve not only to guarantee the substantive rights accorded by the Act; the procedural rights, in and of themselves, form the substance of IDEA. Congress addressed the problem of how to guarantee substantive rights to a diverse group by relying on a process-based solution. Thus, Congress envisioned that compliance with the procedures set forth in IDEA would ensure that children with disabling conditions were accorded a free appropriate public education. See Rowley, 458 U.S. at 205-06, 102 S.Ct. at 3050-51. The central role of the IDEA process rights bears witness that Congress intended to create procedural rights the violation of which would constitute injury in fact. See Monahan v. Nebraska, 491 F.Supp. 1074, 1086 (D.Neb.1980), aff'd in part, vacated in part, 645 F.2d 592 (8th Cir.1981).
 
 
 24
 The Office of Special Education and Rehabilitative Services regulations implementing section 1415 also interpret IDEA as guaranteeing adjudicatory independence. According to the regulations, "[a] hearing may not be conducted ... [b]y any person having a personal or professional interest which would conflict with his or her objectivity in the hearing." 34 C.F.R. § 300.507 (1991). Heldman alleges, of course, that the New York system selects adjudicators who are beholden to the school district in violation of section 300.507. See Mayson v. Teague, 749 F.2d 652, 658-59 (11th Cir.1984) (interpreting 34 C.F.R. § 300.507 as basis for prohibiting any employee of a public school system or those who are involved in educational policymaking from serving on panels which review IEPs at state level).
 
 
 25
 IDEA's language, legislative history, structure, and implementing regulations all bear witness that the Act prohibits the use of biased adjudicators--a prohibition that section 1415(e) permits parents to enforce in federal court. Congress, thus, conferred on the parents of disabled children an enforceable legal right to an impartial hearing officer. If Heldman's allegations are correct, the New York system of selecting hearing officers, as applied to him, denied him his due process rights under IDEA and resulted in actual injury. We turn now to the remaining requirements for standing.
 
 2. Fairly Traceable
 
 26
 To establish standing, a plaintiff must also demonstrate a causal nexus between the defendant's conduct and the injury. See Allen, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19. The causation requirement ensures that the injury alleged is attributable to the defendant. The injury claimed--in this case, a denial of the IDEA guarantee of an impartial adjudicator--must be fairly traceable to the governmental conduct claimed as illegal. The government conduct at issue here is the enactment of N.Y.Educ.Law § 4404 and the promulgation, by NYSED, of its implementing regulation, 8 N.Y.C.R.R. § 200.5(c)(1), pursuant to which the Minisink Board of Education selected the hearing officer who was to hear Heldman's challenge to his son's IEP.
 
 
 27
 The critical issue in applying the causation requirement is what constitutes a sufficient causal nexus for standing. The notion of "causation," however, is sufficiently complex to receive eleven pages of treatment in the Encyclopedia of Philosophy. 2 Encyclopedia of Philosophy 56-66 (1967) (entry authored by Richard Taylor). The Supreme Court, acknowledging that the components of standing are "not susceptible of precise definition," directed courts to find guidance in the developing case law. Allen, 468 U.S. at 751, 104 S.Ct. at 3324. Accordingly, we turn to Allen v. Wright, in which the Court engaged in perhaps its most indepth analysis to date of the "fairly traceable" requirement. Id. at 756-59, 104 S.Ct. at 3324. On the basis of that requirement, the Court denied parents of children attending public schools standing to bring a claim that the Internal Revenue Service ("IRS"), by granting tax-exempt status to racially discriminatory schools, diminished their children's opportunity to receive an education in racially integrated schools. The Court found that the connection between plaintiffs' alleged injury and the IRS conduct was attenuated and that the injury "result[ed] from the independent action of some third party not before the court." Id. at 757, 104 S.Ct. at 3328 (quoting Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)). A plaintiff does not lack standing simply by virtue of the indirectness of his or her injury, however. See Meese v. Keene, 481 U.S. 465, 472-77, 107 S.Ct. 1862, 1866-69, 95 L.Ed.2d 415 (1987) (potential distributor of a foreign film has standing to challenge characterization of a film as "political propaganda" which would affect his reputation and harm his chances for reelection to public office); United States v. SCRAP, 412 U.S. 669, 688-90, 93 S.Ct. 2405, 2416-17, 37 L.Ed.2d 254 (1973) (environmental group has standing to challenge Interstate Commerce Commission rate increase which, allegedly, would decrease the use of recycled materials, which in turn would impact the environment impairing the members' use of forests and streams). The Allen Court noted that plaintiffs' injury would satisfy the fairly traceable requirement if they had alleged all the links in the chain of causation. 468 U.S. at 757-58, 104 S.Ct. at 3327-28. In Allen, plaintiffs failed to allege that there were enough racially discriminatory schools receiving tax exemptions to make a difference in the racial mix of the public schools.
 
 
 28
 The case before us, in contrast, does not present the "missing link" scenario; thus, it is distinguishable from Allen. New York state created a two-tiered system of IEP review designed to implement the procedural protections required by IDEA; Minisink, in compliance with the state regulations, selected the hearing officer who would review T.H.'s IEP, which in turn is alleged to have caused T.H.'s injury. Although a third party not before the court--Minisink--played a role in T.H.'s alleged injury, Minisink's actions were the direct result of the regulations and do not constitute "independent action." Furthermore, unlike the complaint in Allen, Heldman's pleadings aver the existence of this intermediate link between the state regulations and the injury.3. Redressability
 
 
 29
 To satisfy the redressability hurdle, a plaintiff must demonstrate the likelihood that the relief requested would, in principle, redress the injury alleged. See Orr v. Orr, 440 U.S. 268, 271-72, 99 S.Ct. 1102, 1107-08, 59 L.Ed.2d 306 (1979); Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 43-46, 96 S.Ct. 1917, 1926-28, 48 L.Ed.2d 450 (1976); see also Allen, 468 U.S. at 758, 104 S.Ct. at 3328 (discussing redressability concerns as part of causation analysis).[8] Heldman challenges NYSED regulation 8 N.Y.C.R.R. § 200.5(c)(1) and seeks to enjoin NYSED from permitting school districts to select hearing officers pursuant to these regulations. The question posed by the redressability prong of the standing analysis is whether such an injunction would be likely to redress the violation of Heldman's right to an impartial hearing conferred by section 1415. To answer this question we must examine whether this injury is redressable even though the nexus between the judicial relief and the injury is mediated by a third party--the local school districts. As with the causation requirement, indirectness of redressability is not dispositive, if the plaintiff alleges the links in the chain of redressability. In the case at hand, the nexus between relief and redress is easily established. Minisink must adhere to the NYSED regulations when it selects hearing officers; therefore, the prospective relief will prevent future violations of Heldman's right to an impartial hearing.
 
 
 30
 The Commissioner of Education argues that, because Heldman has withdrawn T.H. from Minisink and has no hearing pending before a local hearing officer, this relief will not inure to T.H.'s benefit. This argument conflates the redressability analysis and the closely related issue of whether the case is moot. Rephrased in terms of the mootness doctrine, the Commissioner's argument is that Heldman no longer has a sufficient personal stake in the outcome of the litigation to permit this court to consider the case. We disagree. T.H. is currently nineteen years old and has not yet completed a high school education. Although he is not currently enrolled in the public schools and has no pending IEP review hearing, T.H. remains entitled to a free appropriate public education and an impartial review of his IEP in New York state until he reaches age twenty-one. See §§ 1412(2)(B), 1415(b)(2); N.Y.Educ.Law §§ 3202, 4401(1) (McKinney 1981 & Supp.1992). Because the threat of future denial of an impartial hearing is sufficiently real and the right to contest an IEP is integral to active parental participation in the yearly process of determining what constitutes an appropriate education for their child, Heldman retains enough of a personal stake in the outcome for us to retain jurisdiction over this case.[9]B
 
 
 31
 We conclude that Heldman, as the father of a child with a disabling condition, has standing to challenge the New York procedures for the selection of hearing officers. Heldman also seeks associational standing, however. See Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 342-43, 97 S.Ct. 2434, 2440-41, 53 L.Ed.2d 383 (1977). Although Heldman states in his complaint that he is "the president of the New York State Chapter of a special education parents support and advocacy organization," the organization is not a party to the suit nor does he allege that he has the power, as chapter president, to speak for the organization. Further, on the basis of Heldman's arguments, it is difficult to ascertain whether he is in fact claiming third-party standing as a lay advocate for parents instead of organizational standing. See Department of Labor v. Triplett, 494 U.S. 715, 720-21, 110 S.Ct. 1428, 1431-32, 108 L.Ed.2d 701 (1990). On remand, accordingly, the district court should afford Heldman an opportunity to amend his complaint to clarify the second capacity in which he claims standing. See Havens, 455 U.S. at 377-78, 102 S.Ct. at 1123-24; Sierra Club v. Morton, 405 U.S. 727, 736 n. 8, 92 S.Ct. 1361, 1366 n. 8, 31 L.Ed.2d 636 (1972).
 
 III
 
 32
 The Commissioner contends that Heldman failed to exhaust his state administrative remedies before bringing this action in federal district court. According to this argument, the structure of section 1415 reveals that Congress intended to limit the scope of civil suits brought pursuant to section 1415(e) to challenges of final decisions of state administrative agencies relating to the evaluation or placement of a disabled child. No such exhaustion occurred in the present case; therefore, barring an exception to the exhaustion requirement, Heldman is not entitled to judicial relief for his alleged injury. Heldman brought this action following the failure of the hearing officer to recuse himself, prior to a decision by either of the two levels of state administrative review. The only proper manner in which to bring the present claim, according to the state, was to appeal the Commissioner's ruling.[10]
 
 
 33
 Normally, actions brought under IDEA must adhere to the exhaustion requirement. Riley v. Ambach, 668 F.2d 635, 640-41 (2d Cir.1981). The case law, however, has carved out an exception to this requirement in situations in which exhaustion would be futile because administrative procedures do not provide adequate remedies. See, e.g., Honig, 484 U.S. at 326-27, 108 S.Ct. at 605-06 (1988) (permitting suit pursuant to section 1415 to be brought directly in federal district court without exhausting administrative remedies); Smith v. Robinson, 468 U.S. 992, 1014 n. 17, 104 S.Ct. 3457, 3469 n. 17, 82 L.Ed.2d 746 (1984); J.G. v. Board of Educ., 830 F.2d 444, 446-47 (2d Cir.1987); Jose P. v. Ambach, 669 F.2d 865, 868-70 (2d Cir.1982). The existence of a futility exception to section 1415's exhaustion requirement can be traced to the legislative history of the 1975 Act. Senator Harrison Williams, the author and floor manager of the Senate bill, stated that "exhaustion of the administrative procedures established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter." 121 Cong.Rec. 37416 (1975).[11] The futility exception is particularly relevant in actions, such as the one at hand, that allege systemic violations of the procedural rights accorded by IDEA.
 
 
 34
 The exhaustion doctrine prevents courts from undermining the administrative process and permits an agency to bring its expertise to bear on a problem as well as to correct its own mistakes. See McKart v. United States, 395 U.S. 185, 193-95, 89 S.Ct. 1657, 1662-63, 23 L.Ed.2d 194 (1969); Riley, 668 F.2d at 640; see also Kenneth C. Davis, Administrative Law Treatise ch. 26 (1983). The policies underlying the exhaustion requirement do not come into play, however, when pursuit of administrative remedies would be futile because the agency either was acting in violation of the law or was unable to remedy the alleged injury. Resort to the New York state administrative process in this case would be futile. Heldman claims that the NYSED regulation specifying the hearing officer selection procedure violates the mandate of IDEA. Because the regulation implements a New York statute, neither the Commissioner nor the assigned hearing officer has the authority to alter the procedure; therefore, it would be an exercise in futility to require Heldman to exhaust the state administrative remedies. See Monahan, 491 F.Supp. at 1086. To require a systemic challenge, such as Heldman's, to pursue administrative remedies would not further the purposes of IDEA and would only serve to insulate the state procedures from review--an outcome that would undermine the system Congress selected for the protection of the rights of children with disabilities.[12]
 
 IV
 
 35
 We find that Heldman has standing to challenge 8 N.Y.C.R.R. § 200.5(c)(1) and N.Y.Educ.Law § 4404 and that this challenge falls within the futility exception to IDEA's exhaustion of remedies requirement. We therefore reverse the district court's order dismissing Heldman's complaint. With regard to Heldman's claim of associational standing, on remand the district court should afford Heldman an opportunity to amend his complaint.
 
 
 
 [1]
 In 1990, Congress changed the name of the Education of the Handicapped Act to IDEA. Pub.L. No. 101-476, 104 Stat. 1141. Although the events that led to the present suit occurred prior to the effective date of the 1990 Amendments, we refer to the Act using its current name
 Congress first addressed the education of children with disabilities in the 1966 amendments to the Elementary and Secondary Education Act of 1965 (ESEA). Pub.L. No. 89-750, 80 Stat. 1191, 1204; see Erwin Levine & Elizabeth Wexler, PL 94-142: An Act of Congress 21-33 (1981). In 1970, the Education of the Handicapped Act, Pub.L. 91-230, 84 Stat. 175, replaced the ESEA provisions. Levine & Wexler, supra, at 34-37. Congress subsequently enacted the Education Amendments of 1974 ("the 1974 Act"), an interim provision, which for the first time addressed the right of children with disabilities to receive an education. Pub.L. No. 93-380, 88 Stat. 541, 579, 583; Levine & Wexler, supra, 42-71. The following year, Congress enacted the Education for All Handicapped Children Act of 1975 ("the 1975 Act"), which, despite amendments, remains the foundation for IDEA.
 
 
 [2]
 The relevant portion of section 1415(b)(2) provides:
 [T]he parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child.
 
 
 [3]
 The relevant portion of section 1415(c) provides:
 If the [initial hearing] is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing.
 
 
 [4]
 Section 1415(e)(2), in pertinent part, provides:
 Any party aggrieved by the findings and decision made [during administrative review] shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.
 
 
 [5]
 Effective July 1, 1990, a state review officer, instead of the Commissioner of Education, reviews the initial hearing. N.Y.Educ.Law § 4404(2); 8 N.Y.C.R.R. 276.10 (1991); see also Burr v. Ambach, 863 F.2d 1071, 1077 (2d Cir.1988) (review by the Commissioner of Education does not satisfy § 1415's impartiality requirement), vacated, 492 U.S. 902, 109 S.Ct. 3209, 106 L.Ed.2d 560 reaff'd, Burr v. Sobol, 888 F.2d 258 (2d Cir.1989), cert. denied, 494 U.S. 1005, 110 S.Ct. 1298, 108 L.Ed.2d 475 (1990)
 
 
 [6]
 Article III states that "[t]he judicial Power shall extend to all Cases ... [and] Controversies ...," which has been interpreted to mean that federal courts may only hear cases or controversies. See, e.g., Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)
 
 
 [7]
 Recently, members of the Supreme Court and commentators have questioned the nexus between the mootness doctrine and Article III. See Honig, 484 U.S. at 329-32, 108 S.Ct. at 607-09 (Rehnquist, C.J., concurring); Evan Lee, Deconstitutionalizing Justiciability: The Example of Mootness, 105 Harv.L.Rev. 605 (1992); see also United States Parole Comm'n v. Geraghty, 445 U.S. 388, 404 & n. 11, 100 S.Ct. 1202, 1213 & n. 11, 63 L.Ed.2d 479 (1980). This case, however, does not require us to venture a view as to whether the mootness doctrine is prudentially or constitutionally based
 
 
 [8]
 The causation and redressability analyses overlap one another, particularly where, as in the present case, the remedy requested is the cessation of allegedly illegal conduct. National Wildlife Fed'n v. Hodel, 839 F.2d 694, 705 (D.C.Cir.1988); see also Allen, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19
 
 
 [9]
 Even if we were to find Heldman's complaint to be moot, this case falls within the wrongs "capable of repetition, yet evading review" exception to the mootness doctrine. See Honig, 484 U.S. at 317-23, 108 S.Ct. at 600-04; Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982). In Honig v. Doe, 484 U.S. at 317-23, 108 S.Ct. at 600-04, the Supreme Court found that the expulsion of Jack Smith, who was 20 years old and no longer enrolled in the public schools, in violation of his IDEA-rights was justiciable under the capable of repetition exception to mootness. The Court found that if Smith returned to school he was likely to engage in the same conduct--conduct that arose from his disabling condition--and the school was likely to react by expelling him; therefore, there was a reasonable likelihood that Smith would suffer a similar harm in the future. Id. at 318 n. 6 & 323, 108 S.Ct. at 601 n. 6 & 604 (citing Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983)). Furthermore, the Court concluded that, because review under IDEA tends to be ponderous, any future claim by Smith might evade review. Honig, 484 U.S. at 322-23, 108 S.Ct. at 603-04
 The case before us parallels the Court's findings in Honig. First, with regard to the reasonable expectation prong of the analysis, if T.H. were to return to school, there is a likelihood that a dispute would arise concerning his IEP, that Minisink would select a hearing officer pursuant to 8 N.Y.C.R.R. § 200.5(c)(1), giving rise to the same alleged violation of T.H.'s IDEA-rights. Second, the time required for review under IDEA is likely to prevent review of future claims brought by T.H.
 
 
 [10]
 As the Commissioner notes, if Heldman were to argue that his amended complaint of August 31, 1990 constituted an appeal from the Commissioner's decision of November 15, 1989, then the action would run afoul of the four month New York statute of limitations for appeals from final administrative decisions. See Adler v. Education Dep't, 760 F.2d 454, 455 (2d Cir.1985)
 
 
 [11]
 The congressional understanding of the futility exception is spelled out in more detail in the legislative history leading to the Handicapped Children's Protection Act of 1986 (1986 Act), Pub.L. 99-372, 100 Stat. 796 (codified at 20 U.S.C. 1415(e)(4)(B)-(G) & (f) (1988)). Although the 1986 Act dealt primarily with attorneys' fees, this issue was linked to the question of exhaustion of remedies. See 20 U.S.C. § 1415(f) (1988). Senator Paul Simon, a cosponsor of both the 1975 Act and the 1986 Act, defined more precisely the parameters of the futility exception:
 It is important to note that there are certain situations in which it is not appropriate to require the exhaustion of [IDEA] administrative remedies before filing a civil law suit. These include complaints that: First, an agency has failed to provide services specified in the child's individualized educational program [IEP]; second, an agency has abridged or denied a handicapped child's procedural rights--for example, failure to implement required procedures concerning least restrictive environment or convening of meetings; three, an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law, or where it would otherwise be futile to use the due process procedures--for example, where the hearing officer lacks the authority to grant the relief sought; and four, an emergency situation exists....
 
 
 [131]
 Cong.Rec. 21392-93 (1985); see also H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985)
 
 
 [12]
 We do not reach the broader question of when a party may challenge the bias of hearing officers prior to the exhaustion of administrative remedies. See Touche Ross & Co. v. SEC, 609 F.2d 570, 575 (2d Cir.1979); K. Davis, Administrative Law Treatise § 26.3 (1983). In this case, in contrast to the more general issue, we are faced with allegations of a structural shortcoming that allegedly resulted in the denial of an impartial hearing, which in turn violated a clear statutory provision. See Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 79 (D.C.Cir.1984); Association of Nat'l Advertisers v. FTC, 627 F.2d 1151, 1179-80 (D.C.Cir.1979) (Leventhal, J., concurring), cert. denied, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980). Furthermore, Heldman's challenge falls within a well established exception to the exhaustion requirement--an exception crafted to alleviate the need for administrative exhaustion where the administrative remedies would be inadequate