281 F.Supp.2d 710 (2003)
Michael and Michiko ANTONACCIO, on behalf of their disabled son, Alex, Plaintiffs,
v.
BOARD OF EDUCATION OF ARLINGTON CENTRAL SCHOOL DISTRICT, Manager Rita Levay, Commissioner Richard Mills, in their individual capacities, and the State Education Department of the State of New York Defendants.
No. 01 CIV. 5586(CM).
United States District Court, S.D. New York.
September 8, 2003.
*711 *712 Rosalee Charpentier, Family Advocates, Inc, Kingston, NY, for Plaintiff.
Wendy F. Klarfeld, Wendy Klarfeld Brandenburg, Raymond G. Kuntz, III, Raymond G. Kuntz, P.C., Wendy Klarfeld Brandenburg, Raymond G. Kuntz PC, Bedford Village, NY, Lynette M. Phillips, NYS Attorney General Office, Eliot Spitzer, Atty. General, New York City, for Defendants.

MEMORANDUM DECISION AND ORDER
MCMAHON, District Judge.
Plaintiffs Michael and Michiko Antonaccio bring this action on behalf of their son, Alex, against the Board of Education of Arlington Central School District ("School District") and the New York State Education Department ("Education Department"). Plaintiffs allege that the School District has violated the Individuals with Disabilities Education Act ("IDEA") and the State Department has violated the IDEA, Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act ("ADA"), and 42 U.S.C. § 1983 ("Section 1983"). In addition, the School District has filed a cross-claim against the Department pursuant to the IDEA. Before the Court are the School District's motion for summary judgment on the Antonaccios' claims, and the Education Department's motion to dismiss the School District's cross-claim.
The School District's motion is granted. In addition, the School District's claim against the State Department is dismissed as moot.

BACKGROUND

I. The Statutory Scheme

The IDEA is part of "an ambitious federal effort to promote the education of handicapped children." Board of Educ. v. Rowley, 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (interpreting the Education for All Handicapped Children Act, the IDEA's predecessor statute). The statute endeavors to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 28 U.S.C. § 1400(d)(1)(A). Toward that end, the IDEA conditions the states' receipt of federal funds upon their implementation of policies and procedures that comply with certain statutorily prescribed procedural and substantive standards. See 20 U.S.C. § 1412. New York State receives federal funds under the IDEA, and it is obligated to comply with the statute's requirements.
The IDEA requires that a written program statement, called an Individualized Education Program ("IEP"), be developed for each individual disabled child and at least annually reviewed by an "IEP Team" composed of, among others, the child's parents, a school official qualified in special education, the child's teachers, and, where appropriate, the child. See 20 U.S.C. § 1414(d)(1)(B). In New York, a child's IEP is produced by a Committee on Special Education ("CSE"), the members of which are appointed by school boards or the trustees of school districts. See N.Y. Educ. Law § 4402(1)(b)(1) (McKinney 2002).
The IDEA mandates a review process for parents who are dissatisfied with their child's IEP. 20 U.S.C §§ 1415(b)(6); 1415(f)-(g). New York provides for a two-tiered administrative review process. See *713 N.Y. Educ. Law § 4404 (McKinney 2002). A parent who wishes to challenge his or her child's IEP may first request a due process hearing, which is to be conducted by an impartial hearing officer ("IHO") appointed by the local board of education. See N.Y. Educ. Law § 4404(1). The IHO must render his decision no later than forty-five days after the local board of education receives a request for a hearing. See 34 C.F.R. § 300.511(a)(1); 8 N.Y.C.R.R. § 200.5(i)(4). That deadline may be extended at the request of either the school district or the parent. See 34 C.F.R. § 300.511(c); 8 N.Y.C. R.R. § 220.5(i)(4)(i).
Either the child's parents or the local educational agency may appeal the IHO's decision to a state review officer ("SRO"). See N.Y. Educ. Law § 4404(2). After exhausting these administrative remedies, a party may bring an Article 78 proceeding in state court or a federal action under the IDEA. See 20 U.S.C § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

II. Factual Background

Alex Antonaccio was born on November 4, 1984. The Antonaccios moved into the Arlington Central School District in 1994, when Alex was entering the fourth grade. The Arlington CSE devised an IEP for Alex and continued to do so on a yearly basis as required by the IDEA.
In June of 1999, the Antonaccios objected to the School District's 1999-2000 IEP for Alex and requested an impartial hearing pursuant to the IDEA. An IHO held a hearing over the course of eleven days between December 1, 1999 and July 7, 2000. At the hearing, the Antonaccios argued that Alex's 1999-2000 IEP was inappropriate and requested Alex's residential educational placement at Pine Ridge School, a private school located in Vermont. They also asked for an award of compensatory education in the form of summer school.
On August 21, 2000, the IHO upheld the CSE's recommendations for the 1999-2000 school year and denied the Antonnacios' request for compensatory education. The Antonaccios then appealed the IHO's decision to the SRO. The Antonaccios brought this action on June 20, 2001, about eight months after they brought their appeal to the SRO. At that time the SRO had not issued a decision.
The Complaint contained two claims for relief. First, the Antonaccios claimed that the Education Department violated the IDEA, Section 504 of the Rehabilitation Act, and Section 1983 by failing to ensure that both the School District and the SRO complied with the IDEA's mandated administrative procedures. Specifically, they argued that the State Department failed to ensure that the School District and SRO rendered timely decisions as required under state and federal law. Second, the Antonaccios claimed that the School District's IEP for Alex violated the IDEA, both procedurally and substantively. They argued that they should be exempted from the IDEA's exhaustion requirement because exhaustion would be futile.
In a decision dated September 27, 2001, while the Antonaccio's claim before this Court was pending, the SRO upheld the IHO's decision in its entirety. The Antonaccios amended their complaint on November 1, 2001 to obtain judicial review of the SRO's decision. The amended complaint contains three counts, two against the Education Department defendants for their alleged failure to comply with the IDEA's time constraints and a count against the School District challenging the appropriateness of Alex's 1999-2000 IEP.
The School District has moved for summary judgment on the Antonaccio's claim that the 1999-2000 IEP violated the *714 IDEA. It bases its motion on two grounds. First, it argues that the Antonaccios failed to exhaust the available administrative remedies. Second, it argues that the Court should uphold the SRO's decision under the applicable standard of review.
On February 26, 2002, the School District filed a cross-claim against the Education Department. The School District argues that the Education Department harmed it by failing to issue its SRO decision for more than a year after the Antonaccios had appealed the IHO's decision. The Education Department moves to dismiss this counter-claim, arguing that the IDEA does not establish a cause of action by which local educational agencies can sue the state.

DISCUSSION
A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c), Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has made such a showing, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.
Courts have found that "[s]ummary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions." A.S. ex rel. S. v. Norwalk Bd. of Educ., 183 F.Supp.2d 534, 539 (D.Conn.2002) (quoting Wall v. Mattituck-Cutchogue Sch. Dist., 945 F.Supp. 501, 508 (E.D.N.Y.1996)). "The inquiry, however, is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." Id.

I. The School District's Motion for Summary Judgment is Granted

A. The Antonaccios Have Exhausted Their Administrative Remedies

The IDEA vests jurisdiction in district courts to review claims for violations of the statute only upon exhaustion of available state administrative review. See Heldman v. Sobol, 962 F.2d 148, 158 (2d Cir.1992); Hope v. Cortines, 872 F.Supp. 14, 19 (E.D.N.Y.1995), aff'd 69 F.3d 687 (2d Cir.1995). A plaintiff may circumvent this requirement only if "exhaustion would be futile because administrative procedures do not provide adequate remedies." Heldman, 962 F.2d at 158.
While the School District contends the Antonaccios failed to exhaust their administrative remedies, plaintiffs unquestionably *715 did exhaust. According to the School District's own 56.1 Statement of Undisputed Facts, the Antonaccio's requested an impartial hearing over the appropriateness of their son's 1999-2000 IEP, an IHO upheld the appropriateness of the IEP and denied the Antonaccio's request for compensatory education, the Antonaccios appealed the IHO's decision to the New York SRO, and the SRO upheld the IHO's decision in its entirety. Plaintiffs have exhausted their administrative remedies.[1]

B. The 1999-2000 IEP is Appropriate

The School District argues that this Court should uphold the SRO's affirmation of the IHO's determination that the 1999-2000 IEP complied with the IDEA.

1. Standard of Review

A district court must assess IDEA petitions based on the "preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122-23 (2d Cir.1998). This assessment, however, "is by no means an invitation to the courts to substitute their own notions of sound policy for those of the school authorities which they review." M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers, 231 F.3d 96, 102 (2d Cir.2000) (quoting Rowley, 458 U.S. at 206, 102 S.Ct. 3034) (internal quotations omitted). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give `due weight' to these proceedings, mindful that the judiciary generally `lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206, 102 S.Ct. 3034).
Where, as here, a court reviews the appropriateness of an IEP, that court must consider two issues: (1) whether the School District complied with the procedural requirements of the IDEA; and (2) whether the IEP was "reasonably calculated" to confer educational benefits. M.S. ex rel. S.S., 231 F.3d at 102. "The School Board shoulders the burden of proof with respect to both of these issues." Id.
"The initial procedural inquiry is no mere formality," Walczak, 142 F.3d at 129, because "adequate compliance with the procedures prescribed [by the IDEA] would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." Rowley, 458 U.S. at 206, 102 S.Ct. 3034. In order to determine whether a School District has complied with the IDEA's procedural requirements, a court must determine whether an IEP states: "(1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." M.S. ex rel. S.S., 231 F.3d at 102-03 (quoting Walczak, 142 F.3d at 122).
*716 As for whether the IEP was "reasonably calculated" to confer educational benefits, the IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP. In Rowley, however, the Supreme Court rejected the contention that the "`appropriate education' mandated by IDEA requires states to `maximize the potential of handicapped children.'" Walczak, 142 F.3d at 130 (quoting Rowley, 458 U.S. at 197 n. 21, 102 S.Ct. 3034). Yet, an IEP must afford a child with more than "trivial advancement." Id. Thus, "[a]n appropriate public education under IDEA is one that is `likely to produce progress, not regression.'" Id. (internal citation omitted).
In applying this "reasonably calculated" standard, "such objective factors as `[t]he grading and advancement system' are important measures of acceptable progress." Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir.1997) (quoting Rowley, 458 U.S. at 203, 102 S.Ct. 3034). And "[w]hen the handicapped child is being educated in the regular classrooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit." Id. (quoting Rowley, 458 U.S. at 207, 102 S.Ct. 3034) (internal quotation marks omitted).

2. The Administrative Record

The administrative record before this Court consists of (1) a transcript of the hearing in front of the IHO, together with the parties' exhibits at the hearing; (2) the IHO's decision and interim order; (3) plaintiffs' notice of petition and petition for review of the IHO's decision; (4) the School District's answer; (5) plaintiffs' brief to the SRO; (6) the School District's brief to the SRO; and (7) the SRO's decision. A summary of the administrative record follows.

a. The Impartial Hearing

Mr. and Mrs. Antonnacio objected to their son's 1999-2000 IEP on June 15, 1999 and requested an impartial hearing. [IHO Ex. 9].[2] The Board appointed Carl L. Wanderman as IHO to conduct the hearing. [IHO Ex. 1]. By letter dated July 15, 1999, Wanderman scheduled the hearing to begin on August 12, 1999. [IHO Ex. 2]. The Antonaccios requested an adjournment so that they could retain counsel. [IHO Ex. 3]. Wanderman granted their request and set the hearing for September 21, 1999. [IHO Ex. 6]. The Antonaccios requested another adjournment without date. Wanderman again granted their request and eventually set the hearing date for December 1, 1999. [IHO Ex. 7-8]. The parties agreed to extend the forty-five day period within which the IHO was required to render a decision. [IHO Ex. 7]. In the meantime, Alex started ninth grade at Arlington High School.
The parties engaged in informal settlement discussions at the December 1, 1999 hearing. Wanderman adjourned the hearing until January 12, 2000, at the request of the parties, so that the School District could explore possible alternatives to resolve the dispute. [Parents' Ex. A, at 8-9]. The parties again agreed to an extension of the forty-five day period. Id.
Wanderman had agreed to act as a mediator between the parties at the December 1 hearing, with the condition that he would withdraw as IHO at either party's request if the mediation failed. [Parents' Ex. C]. The parties were unable to reach a resolution, and the School District asked *717 Wanderman to withdraw as IHO. [Parents' Ex. B]. The School District felt that Wanderman had adopted the Antonaccio's position during mediation and could no longer be impartial. Wanderman submitted to the School District's request and recused himself by letter dated January 3, 2000.
Ernie M. Levins was appointed IHO. [Parents' Ex. D]. Levins set the hearing for March 1, 2000. Id. The hearing was held on eleven days between March 1 and July 7, 2000. In the meantime, Alex finished the ninth gradethe 1999-2000 school year for which the IEP at issue was developedat Arlington High School.
The IHO heard from eleven witnesses: (1) Lorraine Costello (the School District's CSE Chairperson), [Hearing Tr. 59-332, 1169-1201]; (2) Linda Tyler (Alex's special education reading teacher), id. at 332-89; (3) Joseph DeRosa (a reading specialist), id. at 401-67; (4) Erica Fuller (a school psychologist), id. at 468-92; (5) Gerry Sheedy (Alex's special education teacher for Global History 1 and Study Skills), id. at 501-602; (6) Lori Davis (Alex's special education teacher for English 9 Regents), id. at 607-30; (7) Barbara Donegan (Assistant Superintendent for Pupil Personnel Services), id. at 631-40; (8) James Muraco (Alex's special education teacher for Math and Study Skills), id. at 647-728; (9) Mrs. Antonaccio, id. at 729-66, 947-1160; (10) Margaret Mabie (a reading expert and special education teacher hired by the Antonaccios to evaluate Alex), id. at 772-878; and (11) Tricia DiNizo (Alex's science teacher), id. at 885-922. The IHO also received over a hundred exhibits into evidence. What follows is a summary of the relevant testimony and documentary evidence.

i. Alex's Educational History

Alex's manifested difficulties learning while in nursery school. At age four, he attended the Burke Rehabilitation Center for children with speech and language difficulties. [SD Ex. 8, at 2; SD Ex. 13, at 2].
Alex started school in the Mount Vernon Public School District, and he was classified as learning disabled. [SD Ex. 13, at 2; Tr. 208]. Alex began receiving resource room services for one hour per week. Id. at 6. The Antonaccios were concerned with Alex's progress, and in September of 1993 they took Alex for an independent evaluation at the Rose F. Kennedy Center. Id. at 2.
The 1994-95 IEP developed by the Mount Vernon CSE recommended daily one-hour resource room sessions, one thirty-minute counseling session per week, and two thirty-minute speech/language therapy sessions per week. [SD Ex. 10, at 1-2; Tr. 209].
The Antonaccios moved to the Arlington Central School District in the summer of 1994, and Alex entered fourth grade there in the fall. The Arlington CSE met on October 13, 1994 to develop an IEP for Alex and ultimately recommended a stronger program than the 1994-95 IEP developed at Mount Vernon. [SD Ex. 15; Tr. 211]. The Arlington CSE placed Alex in a "special class" for half the day and in regular educational programs for the other half. The special class had a "12-1 + 1" student-teacher ratioi.e., it was a class with twelve students, one teacher, and one teaching assistant. In addition, the Arlington CSE scheduled Alex for two thirty minute group speech/language therapy sessions per week and individual counseling on a weekly basis for six thirty-minute sessions. Id. The IEP also provided that Alex would take tests with extended time limits, at a special location, and with the questions read to him. Id.
The CSE reconvened on December 8, 1994 and, at the Antonaccios' request, switched Alex to a full regular class program but continued to provide him with *718 speech/language therapy and counseling. [SD Ex. 26; SD Ex. 27, at 2; Tr. 213]. Alex's teachers expressed concern over the reduction of instructional classroom support. [SD Ex. 26, at 5].
Alex received an annual speech/language review on March 3, 1995. [SD Ex. 20]. The review indicated that Alex had received language therapy over the preceding five months, had made "great gains," and "would be considered ineligible for languages services at this time." Id. Accordingly, the CSE discontinued Alex's speech/language therapy when it met on April 7, 1995. [SD Ex. 22, at 1, 4].
The CSE also devised Alex's IEP for the 1995-96 school year at the April 7 meeting. [SD Ex. 23]. The IEP noted that "Alex needs special education support to meet educational goals and objectives," and it placed Alex in regular classes with seven and a half hours of resource room per week. [SD Ex. 23, at 1, 5; Tr. 215].
The CSE met on May 16, 1996 to develop Alex's 1996-97 IEP and found that "Alex needs a very supportive special education program to meet educational goals and objectives." [SD Ex. 28, at 7]. Accordingly, it recommended his placement in a special class for four periods per day and resource room two and a half periods per week. Id. at 1; Tr. 224. Alex continued to participate in regular classes in physical education, home and careers, music, and remedial reading. On January 29, 1997, the CSE modified Alex's IEP to replace his participation in a music class with participation in art in order to improve his fine motor skills and self-concept. [SD Exs. 36-38; Tr. 226].
Alex's 1997-1998 IEP called for resource room one period per day (an additional two and a half periods of resource room per week from the previous year's IEP); placement in a special class three periods per day for English, Study Skills, and Reading; and placement in regular classes for Physical Education, Home & Careers, Science, Technology, Social Studies, and Math (with a special education teacher or teaching assistant available for support in Social Studies and Science). [SD Ex. 44; Tr. 228-29, 231].
On October 14, 1997, the Antonaccios requested a meeting with the CSE to discuss their concerns about Alex. [SD Ex. 44]. In response to the Antonaccios concerns about Alex's ability to understand his homework, the CSE added a daily resource room period and requested teachers to, when necessary, extend Alex's time to complete his homework. [SD Ex. 46, at 7]. The CSE also noted that, according to Alex's teachers, he was handling classroom work. Finally, the CSE determined that Alex was capable of managing a higher level math class and transferred him accordingly. [Tr. 228-29].
On February 4, 1998, the Antonaccios requested that an independent evaluation be done on Alex. [SD Ex. 48]. Veronica Lytle, a school psychologist, performed the evaluation over three days in March and April of 1998. [SD Ex. 48]. Lytle concluded that Alex's math skills were within expectations for his grade placement (seventh grade); his reading and writing skills continued to be significantly below expectations for his age, grade placement, and level of intellectual functioning; he was making academic progress despite his difficulty in reading and writing; his self-esteem was an area of concern, especially in regard to academic achievement; and Alex frequently needed emotional support or encouragement more than academic help. Id. at 4.
Alex's triennial evaluation occurred on April 22, 1998, and the CSE decided to reconvene pending a full language evaluation of Alex. [SD Ex. 58, 59; Tr. 233]. A speech/language therapist conducted the evaluation on May 29, 1998. As a part of *719 the evaluation, the therapist administered two tests: the CELF-3 (Clinical Evaluation of Language Fundamentals, 3rd Edition) and PPVT-III (Peabody Picture Vocabulary Test-III). Based on the test results, the evaluation concluded that Alex's receptive and expressive language abilities were within normal limits. Furthermore, subtests showed that Alex was weaker (though still within the low average range) in the "Word Class" and "Sentence Assembly" categories and stronger in "Recalling Sentences" (memory) and "Semantic Relationships." Because she found that Alex's overall language abilities were within the average range, the therapist did not recommend therapy for Alex. Id.
The CSE reviewed the language evaluation on June 15, 1998 and, for Alex's 1998-99 IEP, recommended one period of resource room per day, three periods of integrated special class per day, and two periods of departmentalized special class per day (in English and Study Skills). [SD Ex. 63]. The CSE further recommended Alex's placement in regular educational programs in Physical Education, Remedial Reading, Science, Technology/Health; Math, and Social Studies. In practice, this meant that Alex had "pull out special classes" two periods a day in English and Study Skills. And for three periods a day, a special education teacher or teaching assistant attended Alex's regular classes in order to help him with the curriculum. [Tr. 234-36]. The CSE recommended this program because it found that the language evaluation "revealed function with age-expected range, with weakness in word classes" and concluded that "[t]his weakness will be addressed within his special education program, as he is not best served nor needing a pull-out program." [SD Ex. 63].
Following the CSE's June 15 meeting, the Antonaccios independently obtained a neuropsychological evaluation of Alex from Dr. Andrea Smoller, a Senior Rehabilitation Neuropsychologist at St. Francis Hospital in Poughkeepsie, New York. [SD Ex. 65]. Smoller concluded that the results of the examination were "consistent with previous evaluations which have shown Alex to be of average intellectual aptitude, but to have severe limitations within the primary academic areas of reading, writing, and spelling." Id. at 6. She recommended that Alex be taught phonics, preferably on a one-to-one basis, to remediate his reading and spelling. Smoller further recommended that Alex be taught in small special classes in other subject areas because his reading difficulties would impair his growth in those areas. Id. at 7.
On October 7, 1998, after the evaluation was completed, the Antonnacios requested that the CSE convene to discuss Alex's IEP. [SD Ex. 68]. The Antonaccios presented the CSE with the neuropsychological evaluation for the first time at the meeting, on December 15, 1998, and the CSE therefore did not have time to review it in detail. [SD Ex. 70, at 7]. Nonetheless, the CSE found that "Alex would benefit from a more intensive reading program to address his decoding, recognition, and comprehension skills," and replaced Alex's remedial reading with a special reading class period per day. Id. In addition, the CSE found that Alex "will continue to need specialized classes in Study Skills and English as well as special education support in content areas," and it noted that "Alex's teachers recommend that Alex's family work with him to at least organize and start his homework when he first gets home from school." Id. In sum, the meeting was largely devoted to looking at Alex's reading levels and moving him into a more intensive class. [Tr. 237]. The change in the IEP reflected an increase in educational services for Alex. Id. at 238.

*720 ii. The 1999-2000 IEP

The CSE met on June 15, 1999 to formulate Alex's 1999-2000 IEP (the IEP that plaintiffs challenge in this proceeding). [SD Ex. 77]. The CSE devoted substantial discussion to Alex's overall progress in reading and writing and to the options available to him at Arlington High School (where Alex was going to start school in the fall). [Tr. 239]. The CSE recommended that Alex work with Arlington High School's reading specialist, who worked with small groups of students, on a daily basis. [Tr. 240; SD Ex. 77, at 2]. In addition, the CSE requested that the special education teacher and reading specialist work together to "maximize the delivery of services for him in the Language Arts area." [Tr. 240; SD Ex. 77, at 1].
The 1999-2000 IEP also placed Alex in special education classes for three core subjectsEnglish, Math, and Global Studies. [Tr. 241; SD Ex. 77, at 2]. The CSE felt that Alex's transition to a new school warranted placing him in special classes, where he would benefit from the support those classes offered. [Tr. 239]. The IEP also gave Alex a period of Study Skills per day, where he could organize himself and start his homework. [Tr. 239; SD Ex. 77, at 2].
The CSE placed Alex in a regular regents Biology class because the class contained a small number of students and a teaching assistant from the special education department worked in the class to assist the special education students who needed help. [Tr. 241; S.D. Ex. 77, at 2].
The IEP also provided Alex with counseling for two forty minute sessions per month. The CSE felt that the counseling would help address Alex's frustration and any issues that might arise from his transition to high school. [Tr. 239-40; S.D. Ex. 77, at 1].
Finally, the IEP contained several testing modifications for Alex. Several of the modifications remained from the previous year's IEP. For example, he was to be given twice the amount of time to finish tests. In addition, the 1999-2000 provided that Alex was to take tests in a "flexible setting." [Tr. 241-42; S.D. Ex. 77, at 2]. This meant that he could start taking tests in class but continue taking them in his Study Skills period if he needed additional time.
In addition to the educational services to be provided to Alex during the 1999-2000 school year, the 1999-2000 IEP (1) set forth Alex's performance levels in reading, mathematics, written language, learning rate, speech/language skills, social/emotional development, and physical development (Alex's present level of educational performance), id. at 2-3; (2) set forth goals for written language, study skills, social studies, mathematics, reading, social/emotional, and transitional activities (annual goals and short-term instructional objectives), id. at 4-9; (3) recommended scheduling a transition planning meeting with Alex's "targeted case manager" sometime during the first marking period and stated that Alex planned to work towards achieving a high school diploma and simultaneously explore career choices that paralleled his interests and abilities (transition services as Alex was entering high school), id. at 4; (4) stated that the services were projected to begin on September 8, 2000 and run until June 23, 3000 (projected initiation date and duration for proposed services), id. at 1; and (5) set forth criteria and evaluation procedures for determining whether Alex's instructional objectives were being met. Id. at 4-8. With regard to his mathematics skills, for example, the IEP goal for Alex stated: "Alex will perform the four basic operations with whole numbers with 80% success, as evaluated through teacher observations and evaluated by June 15." Id. at 6.

*721 iii. Testimony at the Administrative Hearing

Lorraine Costello, the School District's CSE Chairperson, testified about the history of Alex's educational program. She also explained how the CSE developed Alex's 1999-2000 IEP and opined that the IEP had been "carefully constructed to give [Alex] the reasonable likelihood of being successful in the areas the I.E.P. covers, the areas of deficit, such as reading, and the areas of writing and to continue the support in content areas, such as English and Math, Global Studies." [Tr. 259].
Linda Tyler, a reading specialist in the Arlington School District, testified about Alex's development and performance in the seventh grade reading class she taught. She also testified about the tutoring she gave Alex during the summer of 1999, after the CSE devised the 1999-2000 IEP. [Tr. 332-89].
In addition to Lorraine Costello, the School District offered the testimony of several of Alex's teachers for the 1999-2000 school year, the year for which the 1999-2000 IEP was formulated and during which the IEP was to be implemented. His reading teacher (Joseph DeRosa) testified, for example, as did his special education teacher for Global History (Gerry Sheedy). [Tr. 401-67; 501-602]. In addition, others from Arlington High School who where knowledgeable about Alex's educational program and performance over the course of the 1999-2000 year testified. Alex's school psychologist (Erica Fuller) testified, for example, as did the Assistant Superintendent for Pupil Personnel Services (Barbara Donegan). [Tr. 468-92; 631-40].
The teachers testified that they implemented the 1999-2000 IEP and they explained Alex's educational program for the year in more detail. The reading teacher testified, for example, that he used a multi-sensory approach that took into consideration the individual strengths and weaknesses of each student in the class. [Tr. 410-11].
In addition, the teachers testified about Alex's progress over the year. They explained that he made fairly good progress, but that his performance waned later in the year as his attendance declined. For example, Alex's Biology teacher testified that Alex was absent four of the last five days of school and missed review for the final exam. [Tr. 911]. She testified that he was generally successful in her class, but his absences affected his ability to pass the course. [Tr. 909-10].
Mrs. Antonaccio testified about Alex's educational history and her involvement in his educational program. She expressed her opinion that Alex was not performing up to the standard that his performance I.Q. indicated he was capable of. [Tr. 991-92]. And she testified to her desire for Alex to be instructed using the Orton-Gillingham approach. [Tr. 963, 1011].
Margaret Mabie testified as an expert for plaintiffs. She described the Orton-Gillingham approach to teaching dyslexic children how to read and write, and she opined that the educational services Alex needed to benefit educationally were not available at public school. Thus, she recommended Alex's immediate placement in a private school that specifically deals with dyslexic children, such as Pine Ridge. [Tr. 812-16].

iv. The IHO's Decision

The IHO issued a lengthy decision. She reviewed Alex's educational background and his performance over the 1999-2000 school year, as evidenced by his teachers' testimony at the hearing.
The IHO first concluded that Alex's 1999-2000 IEP was appropriate, basing her decision on (1) testimony concerning Alex's performance during the 1999-2000 *722 school year, [IHO Decision 17-21]; (2) a comparison with the case Pascoe v. Washington Central Sch. Dist., 1998 WL 684583 (S.D.N.Y. Sept. 29, 1998), [IHO Decision 17-18]; and (3) test results that showed Alex was making progress in reading. [IHO Decision 20]. Second, the IHO found, though it was not necessary for her to do so, that plaintiffs had not sustained their burden of proving that the school plaintiffs proposal to place Alex in (Pine Ridge School) was appropriate for him. [IHO Decision 21-23]. Third, the IHO rejected plaintiffs request for compensatory education because she found there was no basis to conclude that Alex would be unable to earn a high school diploma prior to reaching the age of twenty one. [IHO Decision 24]. Finally, the IHO directed the School District to assign a tutor to Alex two or three days a week, during or after school, to assist him with his homework. [IHO Decision 24].

b. The Appeal to the State Education Department

Plaintiffs appealed to the State Education Department, arguing that Alex's 1999-2000 IEP violated both the procedural and substantive requirements of the IDEA. Procedurally, plaintiffs argued that the School District violated the IDEA because (1) the School District failed to hold an impartial hearing within forty-five days after plaintiffs' request; and (2) the 1999-2000 IEP (a) inadequately stated Alex's current levels of functioning, and (b) failed to properly address Alex's annual and short term goals. Substantively, plaintiffs argued that the 1999-2000 IEP was not reasonably calculated to confer educational benefits on Alex.
In a twelve-page single-spaced decision, the SRO rejected plaintiffs arguments and upheld the IHO's determination. He concluded that the record demonstrated that the IHO, by letter dated July 15, 1999, scheduled the hearing to begin more than forty-five days, after the Antonaccios requested a hearing (June 15, 1999), and he urged the School District to ensure that hearings are scheduled in a more timely manner. He found, however, that the Antonaccios had requested a postponement of the hearing on July 19, 1999, and noted that the applicable regulations permit a party to consent to an extension of the forty-five day time frame. See 34 C.F.R. § 300.511(c). [SRO Decision 7-8].
The SRO further concluded that the 1999-2000 IEP accurately identified Alex's present level of performance because it contained scores from (1) group and individualized standardized tests in reading and mathematics administered in April and May of 1999; (2) tests assessing Alex's written language skills; and (3) diagnostic tests assessing his speech/language skills administered in May of 1998 and 1999. [SRO Decision 8-9]. In addition, the SRO found that the 1999-2000 IEP sufficiently included annual goals in reading, written language (including spelling, English, and study skills), and social/emotional development. [SRO Decision 9-10].
Finally, the SRO concluded that the 1999-2000 IEP was appropriate based on evidence in the record, which established the following: (1) the CSE had carefully formulated the 1999-2000 IEP to address the needs caused by his disability; (2) Alex's teachers for the 1999-2000 school year implemented the recommendations made by the IEP; (3) standardized tests showed that Alex made progress in reading from 1998 to 1999; and (4) teacher observations from the 1999-2000 school year demonstrated that Alex was making educational progress. [SRO Decision 10-13].

3. Plaintiffs' Arguments Before This Court

Plaintiffs challenge Alex's 1999-2000 IEP both procedurally and substantively. *723 Procedurally, plaintiffs argue that the Antonaccios' right to participate in Alex's education was violated by the SRO's failure to render a decision within thirty days, as the IDEA requires. See 34 C.F.R. § 300.511(b).
Substantively, plaintiffs argue that Alex's 1999-2000 IEP was not reasonably calculated to confer educational benefits on him. They offer three bases for their argument: (1) the SRO improperly relied on subjective teacher testimony instead of objective measurements of Alex's educational progress; (2) the SRO misinterpreted the evaluative data; and (3) the SRO improperly concluded that functioning at the fifth percentile for reading at the age of fifteen represents appropriate progress for Alex.

4. The 1999-2000 IEP was Appropriate

a. Procedural Review

The SRO's failure to issue a timely decision is not relevant to the determination of whether the 1999-2000 IEP that the CSE devised is procedurally appropriate, such as whether it set forth the child's present level of educational performance and annual goals. Plaintiffs conflate their claim against the School District with their claims against the Education Department.
The SRO's failure to issue a timely decision forms the basis of plaintiffs' claims against the Education Department, plaintiffs' first and second causes of action. And insofar as plaintiffs base a claim on the SRO's failure to issue a timely decision, that claim is already the subject of a class action in Schmelzer v. State of New York, No. 01-CV-1864 (JS)(ARL).
The plaintiffs in Schmelzer allege that the State has failed to follow regulations requiring SRO decisions to be issued within 30 days of appeal. Schmelzer, No. 01-CV-1864 (JS)(ARL) at 3. In a Memorandum and Order, Judge Seybert certified the class to include parties to an IHO appeal that has not been or will not be decided by the SRO within 30 days. Id. at 33-34. The class was certified to address the claim for injunctive relief to ensure timely decisions. Id.
Under Rule 12(b)(6), the Declaratory Judgment Act, and the inherent discretion of the court, a court may dismiss an action before it if there exists another pending action addressing the same issues. See Mackey v. Bd. of Educ. for the Arlington Central Sch. Dist., Case No. 02 Civ. 8360 (S.D.N.Y. Aug. 1, 2003). Practical considerations require a court to dismiss a second action if "an identity of issues exists and the controlling issues in the dismissed action will be determined in the other lawsuit." Wright & Miller, Federal Practice and Procedure; Civil 2d § 1360. If there are two lawsuits concerning the same parties and the same issues, priority should be given to the first suit, absent special circumstances that would justify giving priority to the second. See Motion Picture Laboratory Technicians Local 780, I.A.T.S.E. v. McGregor & Werner, Inc., 804 F.2d 16, 19 (2d Cir.1986).
In Bryan v. Werner, 516 F.2d 233 (3d Cir.1975), the Third Circuit specifically addressed a district court's refusal to consider the merits of a claim already at issue in a class action:
[W]e see no error in the district court's refusal to consider the merits of [plaintiff's] challenge to the adequacy of the law library. At the time of the district court decision, a class action challenging the adequacy of all Pennsylvania prison law libraries was pending in the Eastern District of Pennsylvania.... Since plaintiff was a member of that class and thus would be bound by the decision in that case, the district court properly concluded that it would be a waste of judicial *724 effort to decide the same issue being decided in [that] case.
Id. at 239. Because plaintiffs are members of a class that would be bound by the decision in Schmelzer, I dismiss plaintiffs' claims against the Education Department.

b. Substantive Review

Plaintiffs are correct that the IHO and SRO erred insofar as they based their decisions on the observations of Alex's teachers during the 1999-2000 school year. However, their error was not due to the fact that the teachers' observations were subjective. Rather, it was wrong to consider that information because it does not relate to whether the IEP was reasonably calculated to benefit Alex at the time the CSE devised the IEP. Though the Second Circuit has not addressed this precise issue, other courts have found that "appropriateness is judged prospectively so that any lack of progress under a particular IEP, assuming arguendo that there was no progress, does not render that IEP inappropriate." Carlisle Area Sch. v. Scott P. By and Through Bess P., 62 F.3d 520, 530 (3d Cir.1995); Roland M. v. Concord Sch. Committee, 910 F.2d 983, 992 (1st Cir. 1990), cert. denied, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991); Bd. of Educ. of the County of Kanawha v. Michael M., 95 F.Supp.2d 600, 609 (S.D.W.Va.2000). Conversely, ex post evidence of a student's progress does not render an IEP appropriate. Thus, whether the 1999-2000 IEP was reasonably calculated to confer educational benefits on Alex must be evaluated as of the time the CSE devised the IEP, on June 15, 1999, and the IHO and SRO erred by regarding any information regarding Alex's education after that date.
The parties appear to agree on this point. Plaintiffs argue that "[s]eminal caselaw requires that the standard for reviewing the appropriateness of a plan is whether it was reasonably calculated to enable the student to benefit, not whether an after-the fact review happens to show some benefit." [Plaintiffs' Opposition 13]. Similarly, the School District argues that the appropriateness of Alex's IEP should be judged at the time it was drafted, and not in hindsight. [School District Reply 8-9].
Yet reliance on after-the-fact evidence does not completely obviate the deference that a district court must afford an IHO or SRO, see, e.g., Sherman v. Mamaroneck Union Free Sch. Dist., 340 F.3d 87, 92 (2d Cir.2003), because the IHO and SRO relied on additional evidence to support their decisions. Even if I were not to defer to the administrative agencies below because of their reliance on ex post justifications for the 1999-2000 IEP, a preponderance of the evidence developed at those proceedings supports the conclusion that the IEP was appropriate. Id.
The record shows that the CSE acknowledged Alex's deficits in reading and writing, and devised a program geared toward addressing those deficits. The IEP provided for Alex to work with a reading specialist on a daily basis. It also directed the reading specialist to coordinate his efforts with Alex' special education teacher in order to increase the effectiveness of Alex's reading and writing instruction.
In addition, the CSE recognized the pressures Alex would face in starting high school and the difficulties he would face in content classes (such as Math and Social Studies), and it therefore placed him mostly in special education classes. Yet, consistent with the IDEA preference for educating disabled children "to the maximum extent appropriate" together with their non-disabled peers, see 20 U.S.C. § 1412(a)(5), the IEP placed Alex in a regular Biology class. The CSE specifically chose the regular Biology class for Alex because the class size was small and a *725 teaching assistant from the special education department was available to help him with the class.
Plaintiffs argue that regardless of the CSE's efforts in formulating Alex's 1999-2000 IEP, the IEP was not reasonably calculated to confer educational benefits on him because Alex had failed to make more than trivial progress in his education over the preceding years. The SRO rejected this contention, relying on Alex's reading test scores from 1998 and 1999. [SRO Decision 11]. Those scored indicated that Alex's reading skills improved one grade equivalent. Id. Plaintiffs offer expert affidavits to rebut the SRO's reliance on those test scores. [Mabie Aff. ¶ 7; Rissenberg Aff. ¶ 5]. Plaintiffs' experts argue that the increase in scores from 1998 and 1999 is statistically insignificant.
Regardless of whether the test scores relied on by the SRO show that Alex was making progress, other evidence in the record suggests that his reading skills were developing. Alex's reading test scores set forth in S.D. Exhibit 71 show a slow but steady upward trend between from 1994 to 1998. [S.D. Ex. 71]. Similarly, Alex's seventh grade reading teacher testified that Alex scored a 3.3 grade equivalent on the reading test she administered to him in September of 1997 and a 4.7 grade equivalent when she administered the test in January. [Tr. 343]. Her notes concerning Alex indicate that he had advanced from using a first grade textbook when he started in September of 1998 to a fourth grade textbook in April of 1998. [S.D. Ex. 47]. In another textbook, Alex progressed from a fifth grade to a sixth level book. Id. Ms. Tyler concluded that "[a]lthough Alex is not on grade level yet, he has definitely made progress. I am pleased with his improvement." Id. Similarly, Alex's May 29, 1998 evaluation concluded that "[t]est results indicate Alex's overall language ability to be within the average range." [S.D. Ex. 61].
Of course, there is plenty of evidence in the record regarding Alex's difficulty with reading and writing. The "free appropriate education" that the IDEA guarantees, however, does not mean that a student must advance to grade level in every area of learning. Reading, of course, is a critical component of one's education. But, as Judge Jones explained in Pascoe v. Washington Central Sch. Dist., 1998 WL 684583 (S.D.N.Y. Sept. 29, 1998), a child's "reading and writing development is not the only measure of the IEP's effectiveness." Id. at *6.
In Pascoe, the student's reading and writing ability had failed to improve beyond the second grade during his years in the school district. The student had attained passing grades in his regular courses, however, and advanced from grade to grade. Id. Here, there are similar indicia of progress in Alex's education. Alex progressed from grade to grade, for example, and he was progressing toward a receiving a high school diploma and preparing for his Regents Competency Tests.
Moreover, there is a decided preference under the IDEA for educating disabled children in the least restrictive environment capable of meeting their needs. As the Walczak Court explained, "[t]he norm in American public education is for children to be educated in day programs while they reside at home and receive the support of their families. A `residential placement is, by its nature, considerably more restrictive than local extended day programming.'" 142 F.3d at 132 (quoting Carlisle Area Sch. v. Scott P., 62 F.3d 520, 534 (3d Cir.1995)).
The Antonaccios understandably seek the optimal education for their son, and they believe that teaching him using the Orton-Gillingham approach on a one-toone *726 basis at Pine Ridge is best for Alex. But the IDEA does not require a school district to "maximize the potential of a handicapped child." Rowley, 458 U.S. at 197 n. 21, 102 S.Ct. 3034. And it does not require a school district to provide "everything that might be thought desirable by loving parents." Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2d Cir.1989). Even if the student "did not receive a great education in his public school" and his disability was not "addressed in the best way possible," "that is not the standard the state must meet." M.B. v. Arlington Central Sch. Dist., 2002 WL 389151, at *9 (S.D.N.Y. Mar. 12, 2002).
I therefore conclude that, despite its failure to live up to the Antonnacios' expectations, the 1999-2000 IEP's is "appropriate" pursuant to the IDEA. The IEP complies with the procedural prerequisites of the IDEA, and it was reasonably calculated to confer educational benefits on Alex. In addition, it comports with the IDEA's preference for educating children in the least restrictive environment.

II. The School District's Counter-Claim Against the Education Department is Dismissed

In its cross-claim against the Education Department, the School District seeks damagesin the event that this Court reverses the SRO's decisiondirectly attributable to the Education Department's failure to decide the Antonaccios' appeal within the mandatory 30-day deadline.
The Education Department moves to dismiss the School District's cross-claim for failure to state a claim, arguing that the IDEA does not provide the School District with a private cause of action. However, I have ruled in the School District's favor on plaintiffs' claim against it. As a result, the School District's counter-claim is moot.

CONCLUSION
The School District's motion for summary judgment on plaintiffs' claims against it is granted. Plaintiffs' claims against the Education Department is dismissed. The School District's cross-claim against the State Department is also dismissed.
This is the decision and order of the Court.
NOTES
[1] Exhaustion was not complete when this action was originally filed, but was rendered complete once the SRO issued his decision.
[2] Exhibit numbers refer to exhibits from the impartial hearing that the parties provided as a part of the administrative record for review.